UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | * | CRIMINAL NO. 21-08 |
|---|---|---|
| v. | * | SECTION: E |
| JAMES TASSIN | * | |

\* \* \*

## FACTUAL BASIS

Should this matter have proceeded to trial, the United States of America would have proven beyond a reasonable doubt, through the introduction of relevant, competent, and admissible testimonial, physical, and demonstrative evidence, the following facts, beyond a reasonable doubt, to support the charge pending against defendant **JAMES TASSIN ("TASSIN")**.

The National Oceanic and Atmospheric Administration ("NOAA") contracted with Company 1 to complete the Chenier Ronquille Barrier Island Restoration Project, which was designed to restore an eroded barrier island where the Gulf of Mexico meets Louisiana's coastal wetlands. The Chenier Ronquille Barrier Island (the "island") is approximately eight miles east of Grand Isle, Louisiana, in the territorial jurisdiction of the Eastern District of Louisiana. The restoration project involved building up dikes on the outside of the island and then filling in the interior with sediment[1] dredged from the Gulf of Mexico.

A pair of pipelines called Bay Marchand-to-Ostrica-to-Alliance ("BOA") ran underneath and parallel to the dike on northern side of the island. The BOA pipelines were accurately marked for the duration of the restoration project with cane poles and other markers. There were also

---

[1] "Sediment" is used in this document to include mud, sand, silt, clay, etc.

AUSA **NDK**
Def. Counsel 
Defendant

separate cane poles marking buffers zones on either side of the pipelines, running parallel to the pipelines. The pipeline cane poles and the buffer zone cane poles were color-coded.

NOAA's plans for the project allowed Company 1 to dig a deep-water access channel (the "Authorized Access Channel") at the western tip of the island. The Authorized Access Channel ran parallel to the BOA pipelines but south of them, following the same approximately east-west orientation as both the BOA pipelines and the northern dike of the island. The project plans showed that, at the point where the BOA pipelines ran next to the Authorized Access Channel, the BOA pipelines were shallower than the depth that Company 1 was allowed to dig for the Authorized Access Channel.

Construction of the island began in or around May of 2016. Company 1 used several subcontractors. Shallow Water Equipment, LLC ("Shallow Water"), which provided marsh buggies and operators, was initially involved in the project when it was hired by another of Company 1's subcontractors. In or around July of 2016, Shallow Water contracted with, and began working directly for, Company 1. **TASSIN** was employed by Shallow Water as a marsh buggy operator who worked on the project. **TASSIN**'s work involved digging and moving sediment to construct and maintain the dikes that formed the outside of the island.

Company 1 had complete control over **TASSIN**'s work for the island restoration project. Company 1 employees supervised **TASSIN**'s work and gave him instructions regarding what to do, when to do it, and how to do it. **TASSIN** only performed work on the island that Company 1 employees instructed him to perform. Shallow Water had no input regarding what work **TASSIN** performed. Company 1 paid for the marsh buggy and operator as a part of the work arrangement between Shallow Water and Company 1. **TASSIN** understood that if Company 1 was not pleased

2



with his work, it could either hire another company to provide marsh buggies and operators, or require Shallow Water to replace TASSIN.

After the project began, the western entrance of the Authorized Access Channel filled in with sediment and became inaccessible to boats. Instead of reopening the Authorized Access Channel at its western entrance, Company 1 crew boats going to and from the island started entering the Authorized Access Channel from the north, at its eastern edge, much closer to the island than the closed-off western entrance. This required the crew boats to cross the BOA pipelines much closer to the western edge of the island. This north-south channel used by the crew boats (the "North-South Channel") to access the island was not included in the project plans. Neither Company 1 nor its subcontractors were authorized to dig in the North-South Channel. The North-South Channel was shallower than the Authorized Access Channel.

On or about September 2, 2016, multiple Company 1 employees, including Company 1's Site Manager, met with TASSIN and instructed him to dig the North-South Channel approximately five to seven feet deep on the south side and north side of the BOA pipelines. Surveyors employed by Company 1 used color-coded cane poles to mark the outside borders of the North-South Channel that they wanted TASSIN to deepen. That same day, after the flagging was completed, TASSIN began digging the North-South Channel, starting on the south side of the BOA pipeline, using a marsh buggy.

On or about September 3, 2016, TASSIN returned to the island and continued to dig the North-South Channel on the south side of the pipeline, using the marsh buggy. As TASSIN removed sediment from the North-South Channel, he deposited the sediment to the side of the North-South Channel, creating mounds of sediment that were visible above the water line. He also

3



AUSA _NDM_
Def. Counsel
Defendant

drove the marsh buggy across the pipeline, to commence digging the access channel on the north side of the pipeline. **TASSIN** did not work at the site on September 4, 2016.

On September 5, 2016, which was Labor Day, **TASSIN** returned to the island to resume digging the North-South Channel. He started travelling in the marsh buggy, which had been stationed south of the BOA pipelines, heading toward the northern half of the North-South Channel, with the intent to continue digging the North-South Channel on the northern side of the BOA pipelines. While **TASSIN** was near the pipeline, part of the marsh buggy that he was driving struck the pipeline and caused it to leak oil. The oil caused a visible sheen on the water.

After seeing an oil sheen, **TASSIN** stopped the marsh buggy and contacted Company 1 employees. **TASSIN** deployed an oil spill containment kit, and he began to put sediment on the area where oil was leaking. Shortly thereafter, Company 1's Site Manager spoke to **TASSIN** by telephone and instructed him to knock down the sediment that **TASSIN** had been digging for the North-South Channel, so that it would not be visible above the water line. Company 1's Site Manager also instructed **TASSIN** not to tell anyone that **TASSIN** had been digging the North-South Channel. Later, Company 1's Site Manager arrived on the scene, climbed onto the marsh buggy driven by **TASSIN**. Company 1's Site Manager told **TASSIN** to go get a drug test on shore and again told **TASSIN** to not tell anyone that he was digging the North-South Channel, in order to protect both the Company 1 Site Manager and himself. The Company 1 Site Manager also instructed **TASSIN** to prepare a written statement about the incident but not to mention anything about digging. **TASSIN** agreed to follow his instructions.

As instructed by Company 1 Site Manager, **TASSIN** travelled to Port Sulphur, Louisiana to a hospital for a drug test, which proved negative. **TASSIN** also received a telephone call from another Company 1 employee, who told him to go to the Company 1 office in Port Sulphur and

4



AUSA _NDM_
Def. Counsel
Defendant

write a statement about the incident. **TASSIN** followed the Company 1 Site Manager's instructions and drafted a statement that omitted any reference to digging. When **TASSIN** later met with federal agents, he advised them that he had been digging the North-South Channel and that he had followed Company 1 Site Manager's instructions and written a statement on the day of the incident that omitted any reference to digging.

**TASSIN**'s actions, following the direction of the Company 1 Site Manager, resulted in the marsh buggy striking a pipeline and caused the oil leak and resulting sheen. Based on assurances from Company 1 employees, **TASSIN** believed that the BOA pipelines were buried under at least five feet of sediment before he started digging the North-South Channel. However, **TASSIN**'s digging in the North-South Channel on September 2 and 3, 2016, may have affected the amount of sediment covering the pipelines. As a result, on September 5, 2016, before **TASSIN** reentered the North-South Channel in the marsh buggy with the intent to continue digging, **TASSIN** should have requested that a Company 1 surveyor or other employee check the depth of sediment cover over the BOA pipeline. **TASSIN** erroneously relied on the prior assurances of Company 1 that there was sufficient sediment coverage over the pipeline, did not independently measure the sediment coverage on the pipelines, and did not request that Company 1 check the depth of sediment coverage before he resumed his work in the marsh buggy on September 5, 2016. As a result, the marsh buggy punctured the BOA pipeline, causing the oil leak and the resulting oil sheen in navigable waters of the United States.

\*       \*       \*

This proffer of evidence is not intended to constitute a complete statement of all facts known by **TASSIN**, but rather is a minimum statement of facts intended to prove the necessary

5

AUSA _NDK_
Def. Counsel
Defendant


factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there

exists a sufficient legal and factual basis for **TASSIN**'s plea of guilty.

**READ AND APPROVED:**

_____
JAMES TASSIN
Defendant

_____
WALTER BECKER
Attorney for Defendant

_____
NICHOLAS D. MOSES
Assistant United States Attorney

3 - 8 - 21
_____
Date

3/8/21
_____
Date

3/5/2021
_____
Date

6